Lawrence **JACQUES**, Jr.

v.

**OTIS ELEVATOR COMPANY.**

Civ. A. No. 84–555–B.

United States District Court,
M.D. Louisiana.

Jan. 22, 1987.

Edwin R. Woodman, Jr., Baton Rouge, La., for plaintiff.

Robert J. Vandaworker, Taylor, Porter, Brooks & Phillips, Baton Rouge, La., for defendant.

POLOZOLA, District Judge:

Lawrence Jacques, Jr. filed this suit against Otis Elevator Company ("Otis") seeking compensatory damages for personal injuries sustained in an accident involving an elevator manufactured by Otis and installed at the Big Cajun II generating plant in Pointe Coupee Parish, Louisiana. The suit originally was filed in the 18th Judicial District Court, Pointe Coupee Parish, Louisiana, but was removed to this court by Otis. Jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332.[1] Highlands Insurance Company, Inc. (Highlands) intervened as the workmen's compensation insurer of Brown & Root, plaintiff's employer. The parties have stipulated that Highlands has paid the sum of $10,902.71 in workmen's compensation benefits and medical payments.

An Otis freight elevator was used at the site to carry men and construction supplies from floor to floor. This elevator had been modified by Otis at Brown & Root's request so that it could not be "called" from the hall outside the elevator but could be operated only from the inside of the elevator. On April 15, 1983, Jacques was assigned to operate this elevator. Jacques, who had never operated a freight elevator, was given a briefing on how to operate it by his foreman and was then left on his own.

The elevator has a control panel on the inside with a button for each floor and a red stop button. When functioning properly, the elevator stops automatically on the proper floor. The elevator has two sets of doors on it. After stopping, an inner gate approximately six feet tall opens first. Thereafter, an outer door opens vertically. After the gate and door opened, Jacques would push the stop button and the passengers would disembark.

Otis' records show that mechanic Henry Martin and his assistant Donald Woods were called out to repair the elevator on

---

1. Jacques is a citizen of Louisiana; Otis is a New Jersey corporation.

the first day Jacques worked as an operator. They adjusted the hall doors on the twelfth and thirteenth floors and repaired the hall open relay ("HOR") which controls the hall doors. Jacques continued to operate the elevator while repairs were being made. To do so, he was forced to manually close the inner gate and outer door. In order to operate the elevator, he would first close the inner gate, and then, standing on an overturned bucket, would reach over the inner gate and pull down the outer door. When the outer door closed, the elevator would then move from floor to floor.

The accident in this case occurred on April 16, 1983. Apparently, Big Cajun was still having problems with the elevator on this date.

Jacques returned to work the following day and continued to operate the elevator and manually close the doors. At the time the accident occurred, the elevator had been loaded and three or four Brown & Root employees were on the elevator. The elevator was on the eleventh floor. As Jacques manually closed the inner gate and the outer door, the elevator cab started to move. In his panic, Jacques clung to the outer door and was dragged into the elevator shaft and hung there some eleven floors above the ground. Someone in the cab stopped the elevator and Jacques was able to climb onto the roof of the cab. He was then taken to the ground floor. After resting for a while, Jacques drove himself to the hospital for a medical examination.

Plaintiff contends that the defendant, Otis is liable under the doctrine of strict liability and negligence. The defendants deny liability of any kind and, in the alternative, assert that plaintiff was also negligent. The court finds that under the facts of this case, strict liability does not apply. However, the court does find that both Otis and the plaintiff were equally negligent in causing the accident which occurred in this case.

The plaintiff's contention that this is a strict products liability case is without merit. However, for strict liability to apply, the plaintiff must show that there was a defect which was unreasonably dangerous in normal use. Plaintiff contends that the elevator was defective because the HOR (Hall Open Relay) coil which controls the opening and closing of the hall doors had been deliberately by-passed.

Henry Martin testified that if the HOR coil is bad, the hall doors won't open automatically. He further testified, based on the Otis records, that he replaced the HOR coil the day before the accident. He had no independent memory of having repaired the elevator before he left the job on April 15. There was no testimony that the HOR was deliberately by-passed. However, even if it had been by-passed during the time repairs were being made, this would not constitute a defect to bring the case within the realm of products liability.

The plaintiff cites cases under La.C.C. art. 2317 in support of his position that this is a strict liability case. Article 2317 provides:

> We are responsible, not only for the damage occasioned by our own act, but for whom we are answerable, or of things which we have in our custody....

In *Loescher v. Parr*, 324 So.2d 441, 446–47 (La.1976), the Louisiana Supreme Court stated:

> When harm results from the ... defect of a ... thing which creates an unreasonable risk of harm to others, a person legally responsible under those code articles for the supervision, care or guardianship of the ... thing may be held liable for the damage thus caused.... The liability arises from his legal relationship to the ... thing whose ... defect creates an unreasonable risk of injury to others.

In this case, the plaintiff has failed to establish by a preponderance of the evidence that Otis has supervision, care, control or guardianship of the elevator which injured the plaintiff. To the contrary, the evidence shows that the elevator was under the actual control of either Brown & Root or Cajun. The fact that Otis had a repair contract is immaterial. A repair contract does not create a legal relationship for supervision and control.

■ This accident was caused by the negligence of the employees of Otis combined with the contributing negligence of the plaintiff. The court finds that the following actions of Otis contributed to the accident:

1. Allowing the elevator to be operated by and with non-Otis personnel onboard while the elevator was being repaired by Otis.
2. Failing to close the elevator to the public while repairs were being made.
3. By-passing the circuitry in the penthouse which ensures the doors close completely before operating.
4. Instructing Jacques to operate the door by closing inner gate, then leaning over it to close outer door. McNabb testified that he has closed the doors this way himself.
5. Failing to warn the public that the elevator was being repaired and that it was unsafe during the repair period. All three Otis examiners testified that they never put out "Men Working" signs.
6. Otis did not properly repair the elevator on its earlier visits which caused the doors and the electrical system to work in an improper manner.

The court, in summary, finds that Otis was aware of a problem with the elevator but allowed Jacques to continue to use the elevator. No precautions were taken to shut the elevator down while the repairs were being made. The court also questions the validity of the work records submitted by Otis in defense of its case. While the court does not know the reason and none was offered by Otis, the court has trouble reconciling why the records have a cutoff date as noted and the remainder of the work done on the elevators is missing.

Jacques also was negligent in manually closing the outer elevator doors in the manner in which he did on the date of this accident when he knew or should have known that this was a dangerous maneuver. If the red stop button had been pushed, the elevator couldn't have moved. Similarly, if the inner gate had been closed last, the elevator wouldn't have moved. He testified that he knew that this method of closing the doors was dangerous, but he did as he was told. However, to stand on a bucket and reach over the inner gate to close the outer doors can hardly be said to be the act and conduct of a reasonable man. These actions were clearly negligent and contributed to plaintiff's accident.

The court has carefully considered the actions of all parties and finds that the plaintiff and Otis were each negligent and each liability shall be set at 50%.

■ Having found Otis liable, the court must now determine the amount of damages plaintiff is entitled to recover in this case. As noted earlier, the parties have stipulated that Highlands paid the sum of $10,902.71 in workmen's compensation benefits. Highlands is entitled to recover the full amount of its benefits from the plaintiff without any deduction for plaintiff's negligence. Since this accident occurred prior to the 1985 amendment of R.S. 23:1101 B, the court finds that the 1985 amendment to Section 1101 B which only gives the compensation insurer the right to recover the same percentage as the plaintiff is not to be applied retroactively. Thus, Highlands is entitled to recover the sum of $10,902.71 and its amount of recovery in this case cannot be reduced by 50% as the court must do for the plaintiff. Insofar as plaintiff's claim is concerned, the court finds that plaintiff's award should be in the sum of $28,500.00, less 50% for his comparative negligence or the sum of $14,-250.

After the accident of April 16, 1983, Jacques was treated for shock by the Brown & Root first aid man. Thereafter, the plaintiff drove himself to Pointe Coupee Hospital, approximately six miles away, with the first aid man following in his own car. Plaintiff was treated at the emergency room at Pointe Coupee Hospital for bruises and contusions and released.

He was later seen by Dr. Christopher in New Roads who diagnosed a fractured rib and contused back.

Dr. Strange in Baton Rouge saw Jacques on June 28, 1983. He took x-rays and diagnosed healing fractures of the 10th and 11th ribs and lumbosacral strain. On October 20, 1983, six months after the accident, Strange released him to return to his former employment insofar as his orthopedic problems were concerned.

In addition to the orthopedic problems, Jacques developed acrophobia, a fear of heights and elevators, which Dr. Marc Zimmerman, a clinical psychologist, testified was a direct result of the accident. Zimmerman stated that Jacques was 95% disabled from working at heights because of this phobia. However, in a report prepared in March of 1984, Dr. Zimmerman said plaintiff could return to work in one to three months. He also stated that Jacques appeared depressed when he last saw him. It must be noted that the plaintiff last saw Dr. Zimmerman in December 1983 except for one visit right before the trial of this case.

Mrs. Jacques testified that Jacques went back to work after the accident even though he couldn't put on his shirt or lace up his boots without help for three months. Jacques testified that he was on heavy pain medication when he went back to work, was not supposed to lift over twenty pounds, and was supposed to be working light duty. However, he testified that there was not much "light duty" work to be done at the construction site and he was laid off as a part of the reduction in force. It was unclear whether he was laid off as a part of a general layoff or not, but he was not paid workmen compensation until he retained an attorney. Brown & Root then began paying him compensation. The compensation carrier paid $8,800.20 in lost wages and $2,102.51 in medicals.

Jacques retired from the military at age 39. He moved back home and got a job as a laborer with Brown & Root making $5.50 per hour. He did sheet metal repair on aircraft while in the Air Force, but he hadn't been able to find a job in that line of work before the accident or since.

In December 1983, eight months after the accident, he got a job with Wells Fargo making $7.44 per hour, which was more than he was making before the accident. However, he was fired in July of 1984 because he tested positive for marijuana. Plaintiff has not secured regular employment since then.

Based on the evidence presented in this case the court finds that plaintiff is entitled to recover the sum of $5,750.00 in lost wages [2] and the sum of $22,750.00 for past and future pain and suffering, including his alleged disability attributable to his agoraphobia, or a total of $28,500.

In computing the lost wages the court finds that Dr. Strange did not release plaintiff to return to work until six months after the accident. He testified that he did work in pain until he was laid off, but the date he was laid off is not in the record. The compensation carrier began regular weekly payments as of June 12, 1983, which leads the court to believe that plaintiff may have been laid off just prior to that date. Plaintiff did not secure another job until December. The plaintiff is not entitled to recover lost wages after the date he secured the Wells Fargo job. Even though Dr. Zimmerman testified that plaintiff still has his phobia about heights and elevators, plaintiff managed to work for Wells Fargo for six months without any problems until the marijuana incident. Thus, plaintiff is due past wages for a six month period. Plaintiff has fully recovered from his orthopedic injury and has no permanent physical disability. Plaintiff may have some problems associated with heights, but the court finds that based on the evidence, this condition was not treated by any doctor for almost two and a half years prior to the trial. Thus, a total award of $22,750.00 for plaintiff's physical and mental injuries is proper under the facts. Plaintiff's total damage award of $28,-500.00 must be reduced by 50%. Thus, plaintiff's award is $14,250.

2. Plaintiff was earning $220.00 per week. The court added $30.00 to the mathematical computation of 26 weeks at $220.00 per week.

The intervenor is entitled to recover $10,902.71 from this award.

Therefore, plaintiff shall recover the sum of $28,500.00 less 50% for his comparative negligence or the sum of $14,250.

Highlands Insurance Company, Inc. shall recover the sum of $10,902.71 from plaintiff's award.

Plaintiff and intervenor shall be entitled to recover costs and legal interest from the date of judicial demand until paid.

Judgment shall be entered accordingly. Counsel for defendant shall submit a proposed judgment prepared in accordance with this opinion within ten days, which judgment shall be approved as to form by all counsel.